Vern T. STILL and Wanda Still,
Appellants and Cross–
Appellees,

v.

Lloyd CUNNINGHAM, as Assignee
of Northrim Bank, Appellee
and Cross–Appellant.

Nos. S–10680, S–10719.

Supreme Court of Alaska.

July 9, 2004.

Thomas V. Van Flein, Clapp, Peterson & Stowers, LLC, Anchorage, for Appellants and Cross–Appellees.

Gregory L. Youngmun, John D. Harjehausen, Delisio Moran Geraghty & Zobel, P.C., Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

Vern Still was held liable on a personal guaranty, but his wife Wanda was exonerated on the grounds that the obligee violated the Stills' civil rights by requiring Wanda to sign a guaranty. She was awarded partial rather than full attorney's fees for her successful defense.

These appeals present four main contentions. First, Vern contends that the guaranty did not cover the debt in question. Second, Lloyd Cunningham, assignee of the obligee, contends that Wanda should not have been exonerated from liability. Third, Vern contends that he should have been exonerated from liability because his civil rights were also violated. Fourth, Wanda contends that she was entitled to full rather than partial attorney's fees. We conclude that the first three contentions lack merit, but that the fourth is correct.

## II. FACTS AND PROCEEDINGS

### A. Facts

Premier Homes is an Alaska corporation, founded by Vern Still, Lute Cunningham, and Hank Bartos, to import and sell modular homes in the North Pole area. As of 1996, Bartos's shares were in the process of being reacquired and there were four stockholders: Vern Still owned twenty-five percent of the shares, his son Mark also owned twenty-five percent, and Lute Cunningham and his wife Marilyn together owned the remaining fifty percent of the shares. Lute was the president.

On June 5, 1996, Vern and Wanda signed separate but identical guaranties, guarantying the payment of all present and future indebtedness of Premier Homes to Northrim Bank. Although the guaranties referred to a specific loan in a shaded area—Loan 103—they expressly covered all of Premier's present and future indebtedness to Northrim. Language directly below the shaded area stated that "[r]eferences in the shaded area are for Lender's use only and do not limit the

applicability of this document to any particular loan or item." The guaranties contained a clause authorizing the lender, either before or after revocation, to extend the time for payment of an indebtedness without reducing the guarantor's liability.[1]

In 1996 Northrim made ten separate loans to Premier, each financing separate modular units. All but one had been sold as of March 12, 1997. On that date Premier borrowed $203,022 from Northrim in a transaction referred to as Loan 200. The note for Loan 200 was signed by Lute as president. The Northrim loan authorization for Loan 200 lists as guarantors the Cunninghams and the Stills.[2] Specific collateral for Loan 200 included a deed of trust covering a modular housing unit owned by Premier, a deed of trust covering real property owned by Lute and Marilyn, and a real estate contract payable to the Cunninghams under which $125,000 was receivable. The purposes of the loan were (1) to provide season start-up costs for Premier; (2) to pay off the $132,000 balance on an earlier loan from Key Bank; and (3) to pay original shareholder Frank Bartos a sum to complete the reacquisition of his shares.

On March 20, 1997, eight days after Loan 200 was made, Northrim issued a line of credit to Premier not to exceed $750,000. The proceeds were to be used for the purchase and transportation of modular units. Each loan was to be secured by a first deed of trust on a modular unit placed on a lot and by the guaranties of all of the stockholders in Premier. In 1997 some twelve units were financed by Northrim under this line of credit. All of them were placed in Stillmeyer Estates, a subdivision owned by Vern. Five of the units were purchased by Lute and Marilyn as rentals or for resale. It is not clear if these purchases were made from Premier or directly from the manufacturer.

On October 1, 1997, Vern wrote Northrim, revoking the guaranty. The letter stated: "I am writing concerning the guarantee I have signed for Premier Homes of North Pole,

---

1. Lute and Marilyn Cunningham also signed identical guaranties in favor of Northrim on June 5, 1996.

2. Back-up documentation indicates that this is a reference to Vern and Wanda, not Vern and Mark.

Inc. Effective immediately, I am revoking my guarantee. I will not be responsible for any new loans made through the company, unless I personally appear to sign any documents."

Although Northrim had financed approximately twenty units as of Vern's October 1, 1997 revocation, apparently only Loan 200 ultimately proved troublesome. On March 24, 1998, the note was extended to May 25, 1998. On June 26, 1998, the note was extended to October 20, 1998. This extension was accomplished by a document entitled "Change in Terms Agreement," which was signed by Lute as president and Vern as vice-president. Meanwhile, on May 5, June 11, and August 19, 1998, Vern executed new guaranties identical in terms to the June 5, 1996 guaranty that he had revoked, except for references in the shaded areas. A third extension extended repayment to June 30, 1999.

On January 18, 2000, Northrim notified Premier, the Cunninghams, and the Stills that Loan 200 was in default. Eventually the note was purchased by Lute's brother Lloyd. Lloyd paid the balance of the loan, $90,039.26, and took an assignment of Northrim's rights as to collateral and the guaranties.

## B. Proceedings

Lloyd, as Northrim's assignee, brought this action against the Stills under the guaranties of June 5, 1996, to collect the outstanding balance of Loan 200. Lloyd also made a claim against Vern under the guaranties that Vern executed in 1998. Vern and Wanda answered, denying liability. They interposed a third-party complaint against Lute and Marilyn for fraudulently diverting funds from Premier for their own uses, and for breach of their fiduciary duties as officers and shareholders of Premier. The Stills also counterclaimed against Lloyd for civil conspiracy "to set up a sham proceeding in order to bilk Vern and Wanda Still." Lloyd's complaint was alleged to be "in furtherance of this conspiracy." In an amended answer Vern pled another counterclaim against Lloyd, alleging that Vern had done construction work for Lloyd and had not been fully paid.

After some discovery was conducted, Lloyd moved for summary judgment against the Stills based on the June 5, 1996 guaranties and against Vern based on the three guaranties given in 1998. Vern and Wanda opposed the motion on two grounds. They claimed, first, that the guaranties did not cover Loan 200, and second, that Northrim violated federal and state law by refusing to extend credit to Vern, who was independently creditworthy, without first requiring Wanda's guaranty. The Stills also contended that the three extensions of Loan 200 voided their obligation as guarantors. In reply, Lloyd argued that the guaranties explicitly covered all the indebtedness, including extensions or modifications of the indebtedness. Lloyd also contended that Northrim had a legitimate basis for requesting a guaranty from Wanda. The Stills cross-moved for summary judgment, claiming that Northrim had discriminated against them based on their marital status.

The superior court first considered Lloyd's motion for summary judgment. The court ruled from the bench that the 1996 guaranties were continuous in nature and that their terms were not ambiguous.[3] The court de-

---

3. The court stated, in part:

the language is as clear as any that one sees in any of the case law about what the meaning of the guaranty was. And the Stills signed them without question in 1996.

The times that other guaranties were required was after ... Mr. Still revoked that guaranty. And so the conduct is in a different kind of context. And I don't think it ... can be used to raise an ambiguity about what the document said.

... the course of conduct that is actually relevant is the fact that there were no guaranties that were required until Mr. Still revoked his guaranty. That course of conduct says that it was a continuing guaranty and everybody knew it.

... I also find that Mr. Still's letter ... terminating his guaranty wasn't effective with respect to loan number 200. ...

....

... the other issue that was raised had to do with the extensions. And certainly there are some ... times that extensions can void a guaranty. But in these particular guaranties, there were provisions specifically in the guaranties themselves that ... cover[ ] extensions.

So the language is sufficient to take it out of that ... kind of case where there's a voiding by the fact of extensions.

clined to find that extrinsic evidence of conversations between Vern and Gary Roderick of Northrim changed the meaning of the guaranties. The court concluded that Vern's revocation was not effective as to Loan 200 because the revocation was made after the loan. The court also ruled that the extensions did not void the guaranties because the guaranties provided that extensions would not terminate them. But the court reserved decision on the Stills' civil rights claims.

Subsequently, the superior court ruled on the Stills' cross-motion for summary judgment. The court held that the Stills' state and federal discrimination claims were time barred, but that discrimination could be raised as an affirmative defense to the enforcement of the guaranties or as a counterclaim for recoupment. The court ruled that Wanda's guaranty was void, but that Vern's guaranty was enforceable.

The parties settled the Stills' third-party claims against Lute and Marilyn. These were dismissed with prejudice in April 2001. A year later the court ruled that Vern could not assert a claim against Lloyd as a constructive co-guarantor standing in the shoes of his brother Lute. The case then proceeded to a bench trial on Vern's counterclaim for unpaid construction work against Lloyd. The court found in favor of Lloyd and dismissed the counterclaim. The court entered a final judgment in favor of Lloyd against Vern for the full principal amount paid by Lloyd to Northrim for the note plus interest.[4]

Both Lloyd and Wanda moved for attorney's fees. The court awarded Lloyd reasonable actual attorney's fees, as provided in the guaranty, of $28,912.50. Wanda argued that she was also entitled to an award of reasonable actual attorney's fees as a prevailing civil rights litigant. The court determined that Wanda was not entitled to actual fees as a prevailing civil rights claimant, and awarded her partial attorney's fees pursuant to Civil Rule 82. Vern and Wanda appeal and Lloyd cross-appeals.

## III. DISCUSSION

### A. Standard of Review

▪▪▪▪▪ This court reviews an order of summary judgment de novo.[5] Summary judgment is only appropriate where there is no dispute as to material facts, and the moving party is entitled to judgment as a matter of law.[6] "Once the moving party has established a prima facie case, the non-movant is required, in order to prevent the entry of summary judgment, to set forth specific facts showing that he could produce admissible evidence reasonably tending to dispute or contradict the movant's evidence, and thus demonstrate that a material issue of fact exists."[7] On appeal from the grant of summary judgment, this court will construe factual evidence in favor of the opposing party.[8]

### B. Did the Trial Court Err in Ruling that Vern's Guaranty Applied to Loan 200?

Vern's first argument is that the superior court erred when it decided that his June 1996 guaranty was applicable to Loan 200. He claims that the court should have considered the evidence of the parties' intent and practice rather than ruling that there must be an ambiguity before extrinsic evidence can be considered: "the trial court refused to consider the substantial extrinsic evidence showing the parties' intent, at the time of the June 5, 1996 guaranty, that the guaranty was applicable only to Loan No. 103 and not Loan No. 200." He contends that "the Court should have ruled that the guaranty was not applicable to Loan 200, or that at the very least the guaranty, when viewed in context with the extrinsic evidence, was reasonably susceptible to both asserted meanings, requiring a jury trial."

Vern also argues that if this court determines that the guaranty was continuing in nature, "a genuine issue of fact exists regarding unilateral mistake and fraud." He con-

---

**4.** The Stills' conspiracy counterclaim was evidently considered resolved favorably to Lloyd, although the briefs do not describe the procedural mechanism by which this occurred.

**5.** *West v. Umialik Ins. Co.,* 8 P.3d 1135, 1137 (Alaska 2000).

**6.** Alaska R. Civ. P. 56(c).

**7.** *Philbin v. Matanuska–Susitna Borough,* 991 P.2d 1263, 1265–66 (Alaska 1999) (quotations omitted).

**8.** *West,* 8 P.3d at 1137.

tends that Roderick of Northrim told him that his June 5, 1996 guaranty would only apply to the particular loan identified in the shaded area of the guaranty and contends that he would not have signed any of the guaranties if he had been told that they were continuing in nature.

In opposition to the motion for summary judgment, Vern filed an affidavit. The allegations critical to his claim that extrinsic evidence affected the meaning of the guaranties and his claims of mistake and misrepresentation are contained in the following paragraph of the affidavit:

Based on my conversation with Gary at the bank, I was led to understand that some loans needed a guaranty and others didn't, in fact, most didn't, because they were fully secured by the modular units. Gary never told me that the bank thought if I signed just one guaranty I was promising my personal money for every loan the bank would issue to Premier Homes, no matter how large the amount, no matter what the interest rate was, and no matter whether I approved a particular loan. I would not have agreed to that if they did tell me that. When the time came to guarantee some loans, Gary would call me down and I would sign—except for Loan No. 200, which I did not consent to. If you look at the second page of the guaranties, you will see the loan number that the guarantee applies to. This is how Gary explained it to me. Each guaranty was for a particular loan and that was my understanding based on the bank's practice with me.

### 1. The terms of the guaranty cannot be altered by the extrinsic evidence offered by Vern.

Under the terms of the parol evidence rule an integrated written contract cannot be varied or contradicted by prior negotiations or agreements. We explained the operation of this rule in *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School District* as follows:

The parol evidence rule is a rule of substantive law which holds that an integrated written contract may not be varied or contradicted by prior negotiations or agreements. Before the parol evidence

rule can be applied, three preliminary determinations must be made: (1) whether the contract is integrated, (2) what the contract means, and (3) whether the prior agreement conflicts with the integrated agreement. *Alaska Northern Dev., Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33, 37–40 (Alaska 1983), *cert. denied*, 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984). Extrinsic evidence may always be received on the question of meaning. *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 1 (Alaska 1982). Once the meaning of the written contract is determined, however, the parol evidence rule precludes the enforcement of prior inconsistent agreements. *Alaska Northern*, 666 P.2d at 37.

. . . .

This is not to say that the parol evidence rule is easy to apply. There is an obvious tension between using extrinsic evidence of a prior agreement for the purpose of determining the meaning of an integrated contract, and barring the use of a prior agreement to change an integrated contract once its meaning is determined. The evidence which is consulted to determine meaning may be the same evidence which is later excluded, or rendered irrelevant, by the parol evidence rule. However, this apparent conflict is made manageable in most cases by various practical rules. For example, while extrinsic evidence should be consulted in determining the meaning of a written contract, nonetheless "after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention." RESTATEMENT (SECOND) OF CONTRACTS § 212 comment b. Further, questions of interpretation of the meaning of written documents are treated as questions of law for the court except where they are dependent for their resolution on conflicting extrinsic evidence. *O'Kelley*, 645 P.2d at 771 n. 2; RESTATEMENT (SECOND) OF CONTRACTS § 212, comments d, e. The question of the meaning of a written contract, including a review of the extrinsic evidence to determine whether any of the extrinsic evidence is conflicting, is a preliminary question for the court.

Where there is conflicting extrinsic evidence the court, rather than the jury, must nonetheless decide the question of meaning except where the written language, read in context, is reasonably susceptible to both asserted meanings. *Alaska Northern,* 666 P.2d at 39.[9]

In the present case there is no question but that the guaranty was integrated. Further, although Vern's affidavit concerning his conversations with Gary Roderick can be consulted on the question of the meaning of the guaranty, ultimately the language of the guaranty is such that it is not reasonably susceptible to the meaning advocated by Vern. It clearly was not limited to a particular loan, rather it was continuous and applied to all indebtedness incurred by Premier before it was revoked. The superior court correctly decided that the extrinsic evidence referred to by Vern was ineffective to change the meaning of the guaranty.

### 2. Were issues of mistake and misrepresentation raised as defenses to summary judgment?

▮▮▮▮ Vern argues that Gary Roderick told him that the guaranty would only apply to the particular loan identified in the shaded area of the guaranty. He now claims that this was a misrepresentation rendering the guaranty void and that it gave rise to a material mistake on his part that also rendered the guaranty void. A guaranty is voidable if it is induced by a fraudulent or material misrepresentation by the obligee.[10] Similarly, a contract may be voidable because of a mistake of one party as to a basic assumption when the mistake is known to the other party or is due to the fault of the other party.[11] Here Vern's mistake and mis-

representation claims are both based on Roderick's alleged misrepresentation. The parol evidence rule does not apply when the remedy of rescission or reformation is sought as a result of misrepresentation, or mistake.[12] Thus these defenses are not precluded by the parol evidence rule.

But there are two questions that must be resolved in connection with these defenses. First, is Vern's affidavit sufficiently specific to support a claim that Roderick misrepresented the nature of the guaranty? Second, assuming that the affidavit is sufficiently specific to show factual misrepresentation, did Vern nonetheless fail to raise, and preserve for purposes of appeal, the defenses of mistake or misrepresentation? We turn to a discussion of these points.

### a. Is the affidavit sufficiently specific?

▮▮▮▮ In reviewing grants of summary judgment, we view the evidence submitted in opposition to a summary judgment motion in the light most favorable to the opponent, "resolving all reasonable implications that can be drawn from such evidence in favor of the opponent." [13] But we are also justified in disregarding parties' statements made during litigation as to their subjective impressions or intent at the time of a transaction "unless the party in some way expressed or manifested his understanding at the time of contract formation." [14]

Vern's affidavit, quoted *supra* page 9, contains several statements that are properly considered as nonprobative expressions of his subjective impressions and intent. His statement that he was "led to understand" that only some loans needed a guaranty and his

9. 778 P.2d 581, 583–84 (Alaska 1989) (footnotes omitted).

10. Restatement (Third) of Suretyship and Guaranty § 12(1) (1996).

11. Restatement (Second) of Contracts § 153 (1981); *see* Restatement (Third) of Suretyship and Guaranty § 12(3).

12. *Diagnostic Imaging Ctr. Assocs. v. H & P,* 815 P.2d 865, 867 (Alaska 1991).

13. *Norville v. Carr–Gottstein Foods Co.,* 84 P.3d 996, 1003 (Alaska 2004).

14. *Id.; see also Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981):

Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative. Rather, the court must look to the express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement. (Footnotes omitted.)

statement that he would not have agreed to a continuing guaranty, fall in this category. Also, his reference to the guaranties subsequent to the June 5, 1996 guaranty are of doubtful probative effect as to what took place at the signing of the first guaranty, because the subsequent guaranties were signed after he had revoked the first guaranty. But the statement in the penultimate sentence—"this is how Gary explained it to me"—may be an averment of a communication made during the 1996 transaction. It can be interpreted as saying, when considered most favorably to Vern, that Roderick actually told Vern that the guaranty only applied to the loan number listed on the guaranty. As so construed, the affidavit makes a specific claim that Roderick misrepresented the nature of the guaranty.

**b. Did Vern raise the defenses of mistake and misrepresentation in opposition to the motion for summary judgment?**

Even though Vern's affidavit could have supported defenses that the 1996 guaranty should be rescinded or reformed based on mistake or misrepresentation, these defenses were not asserted in Vern's memorandum in opposition to the motion for summary judgment. Instead, he relied on his civil rights defense and on his claim that the guaranties "do not cover the one loan that was in default—Loan No. 200." His memorandum in opposition to the motion for summary judgment extensively develops, for some thirty-seven pages, what appears to be all of his defenses to the motion. Yet at no point does it claim that the guaranty is unenforceable because of misrepresentation or mistake. Indeed, "misrepresentation" or "mistake" are not even mentioned in the memorandum.

Issues that are not raised in the superior court are waived and cannot be asserted on appeal as grounds for overturning a judgment.[15] Here Vern's affidavit was relevant to a defense to the motion for summary judgment that was raised—the coverage of the guaranty—and to two that were

not raised—mistake and misrepresentation. The fact that the affidavit could have supported defenses that were not raised is not, in our view, sufficient to raise them.

Alaska Civil Rule 56(c) sets out the obligations of a party opposing a motion for summary judgment. It states in relevant part:

The adverse party in accordance with Rule 77 may serve opposing affidavits, a concise "statement of genuine issues" setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, and any other memorandum in opposition to the motion.

Vern did not file a document entitled "Statement of Genuine Issues," but his memorandum stated his defenses in detail. Civil Rule 77, referred to in Civil Rule 56(c), requires an opponent to a motion to file "a brief, *complete* written statement of the reasons in opposition to the motion, which shall include an answering brief of points and authorities."[16] An opposing memorandum thus must include all of a party's defenses to a motion. Neither the trial court nor the movants should be required to guess whether factual evidence might support defenses that are not identified or relied on. Here, since Vern did not assert as reasons in opposition to the motion for summary judgment the defenses of mistake or misrepresentation, these defenses are waived and cannot be asserted on appeal.

**C. Neither the Revocation Nor the Extensions Discharged Vern's Liability.**

Vern argues that his revocation in October 1997 of the June 1996 guaranty discharged him from liability for Loan 200. This claim is without merit for Loan 200 was made some eight months before the revocation. The guaranty states that it will "continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's writ-

**15.** *Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage,* 783 P.2d 1164, 1166 n. 2 (Alaska 1989) ("Issues not properly raised or briefed at trial are not properly before this court on appeal.").

**16.** Alaska R. Civ. P. 77(c)(1)(ii).

ten notice of revocation, including any extensions, renewals or modifications of the Indebtedness." Even without such language, it is established that "upon termination of a continuing guaranty, the continuing guarantor remains a secondary obligor with respect to obligations of the principal obligor incurred prior to termination."[17]

Vern also argues that the three extensions without his written consent, as guarantor,[18] voided any obligation that he had under the guaranty. This argument is also without merit. The guaranty explicitly included extensions.[19] A guarantor's consent to future extensions expressed in a guaranty is binding.[20]

### D. Did the Court Err in Failing To Prorate the Debt to All Co–Guarantors?

Citing the general rule that co-sureties between themselves should share the cost of performance of their obligations according to their respective contributive shares, Vern claims that Lloyd should be able to recover from him only twenty-five percent of the amount Lloyd paid in satisfaction of Loan 200. His theory is that Lloyd was the agent of Lute and that if Lute had paid off the entire obligation he would only be entitled to a contribution of twenty-five percent from Vern.

The primary difficulty with this argument is that Vern did not establish that Lloyd was acting as an agent for Lute when he acquired the note. As the trial court ruled, "Lloyd

Cunningham stands in the shoes of Northrim, the principal," and the applicable rule is that "the principal's entitled to recover the entire amount of the guaranty from [Vern]. After [Vern] paid that, he would have a right of contribution from co-guarantors. That's his suit. That's not this suit." Thus while Vern may have claims against Lute and Marilyn for their contributive shares,[21] he did not establish a factual basis for asserting such claims against Lloyd.

### E. Civil Rights Claims

#### 1. The opinion of the superior court

The superior court granted the Stills' civil-rights-based motion for summary judgment. It held that Northrim violated the Stills' rights by requiring Wanda to sign a guaranty without a legitimate justification. The court voided Wanda's guaranty because of this violation, but not Vern's. These decisions are challenged in the current appeal and cross-appeal.

In the process of ruling on the Stills' summary judgment motion the court wrote a thorough opinion. We set out portions of it here in order to establish the legal context for the claims presented:

> A. *Did Northrim violate state and/or federal law when it required Mrs. Still to sign a guaranty for the loan to her spouse's business?*
>
> 1. *State law claim*

---

**17.** Restatement (Third) of Suretyship and Guaranty § 16 (1996).

**18.** He consented to the second extension in his capacity of vice president of Premier. *See supra* page 4.

**19.** The guaranty provided in relevant part:

> **DURATION OF GUARANTY.** This Guaranty ... will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all other obligations of Guarantor under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing.... Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's

written revocation ... This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness.... Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty.

**20.** *See* Restatement (Third) of Suretyship and Guaranty § 48(1).

**21.** *See id.* §§ 55, 57.

The Stills argue that requiring Wanda Still to sign the guaranty before approving the loan to her spouse's business violated Alaska civil rights laws, specifically AS 18.80.200, AS 18.80.210, and AS 18.80.250. Discrimination on the basis of marital status violates public policy in Alaska. Under AS 18.80.210, the opportunity to obtain credit and financing without discrimination based on marital status is a civil right. It is unlawful under AS 18.80.250 for a financial institution extending credit to permit one of its employees (a) to discriminate against a loan applicant because of marital status in a condition to obtaining credit, except to the extent allowed by federal law applicable to the same type of transaction, or (b) to refuse to extend credit to a married loan applicant who is otherwise creditworthy. The Alaska Supreme Court has held that AS 18.80.250 creates a private right of action allowing the aggrieved party to sue for damages for violation of the statute. Alaska's civil rights statutes have been given a high priority in the past and have been construed broadly to further the goal of eradicating discrimination. In general, contract provisions that violate state law are unenforceable. Thus, if Mrs. Still's guaranty violated Alaska civil rights law, it normally would be unenforceable.

AS 18.80.250, unlike other provisions in AS 18.80, expressly excludes any practice permitted by federal law:

(a)(1) ..., except to the extent of a federal statute or regulation applicable to a transaction of the same character

(b) Notwithstanding the provisions of (a) of this section, any practice permitted by federal statute or regulation applicable to financial or credit transactions of the same character as those covered by this section does not constitute discrimination under this section.

The federal Equal Credit Opportunity Act (15 U.S.C. § 1601 et seq.) and Regulation B (12 C.F.R. Pt. 202) apply to all credit transactions without regard to the nature or type of credit or creditor. Therefore, federal law must be analyzed first to determine whether Northrim's requirement of Mrs. Still's guaranty was permitted by federal law.

2. *Did federal law permit Northrim to require Mrs. Still to sign a guaranty before approving a loan to her spouse's business?*

The Stills argue that Northrim violated the Equal Credit Opportunity Act (ECOA), 15 U.S.C.A. § 1691(a)(1) and federal regulations. Regulation B states:

a creditor shall not require the signature of an applicant's spouse ... on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

Federal regulations concerning the signature of a spouse or other person for extensions of credit are found at 12 C.F.R. § 202.7(d). The regulations are intended to assure that qualified applicants are able to obtain credit in their own names. In general, the creditor may not require the signature of a spouse or other person unless the creditor relies upon the future income of the spouse or jointly owned property or the creditworthiness of the spouse or other person. The creditor may require the spouse's signature if the applicant requests unsecured credit and the guaranty relies upon property owned jointly with the spouse to satisfy the creditor's standards of creditworthiness. But the creditor may require the signature only on the instruments reasonably believed to be necessary to enable the creditor to access the property in the event of the death or default of the applicant, and provided that the creditor does not routinely require non-applicant joint owners to sign an instrument that would result in forfeiture of the non-applicant's interest. Moreover, the spouse's signature, which was sought because of property owned jointly, cannot be used to impose personal liability on the spouse for the entire debt.

When an applicant applies for individual credit but does not qualify alone, the creditor may require a cosigner or guarantor but cannot require that the cosigner or guarantor be the spouse. Specifically with respect to spousal guarantees, the official interpretation of 12 C.F.R. § 202.7(d) states that "although a creditor may re-

quire all officers of a closely held corporation to personally guarantee a corporate loan, the creditor may not automatically require that spouses of married officers also sign the guarantee."

One federal district court rejected a creditor's argument that the bank's requirement of guaranties showed that the bank did not consider the debtor to be creditworthy. The court noted that the record contained no evidence that the debtor-spouse was not individually creditworthy in the bank's eyes. Similarly, in this case, the record contains no evidence that Vern Still was not independently creditworthy.

(Citation footnotes omitted.)

### 2. The court did not err in refusing to invalidate Vern's guaranty.

■■■ Vern argues that since the trial court held that his right to obtain credit individually was violated when Northrim required Wanda to act as a guarantor the court should have invalidated his guaranty along with Wanda's. He argues that as a general proposition contracts made in violation of law should be considered void and that this remedy is appropriate in this case in order to vindicate the violation of his civil rights. Although he cites general authority holding that a contractual provision may be invalidated if it is illegal or in violation of public policy, he cites no authority that has invalidated a guaranty that was permissibly required under equal rights lending laws.

A number of cases decided under Regulation B of ECOA have held that while a guaranty that was impermissibly required should be voided, it is not appropriate to void a guaranty that was permissibly required in the same transaction. In general, the reasons for this result are that the civil rights violation caused the impermissibly required guaranty to be signed. But even if the lender had complied with the civil rights law, the permissibly required guaranty still would have been executed. Even though the permissibly bound guarantor must honor his guaranty, he may rely on statutory damage remedies for vindication, assuming the statute of limitations has not run, and assuming that he has suffered damages.

A leading case expressing this reasoning is *Integra Bank/Pittsburgh v. Freeman.*[22] There the court stated:

I conclude, therefore, that while an ECOA violation should not void the underlying credit transaction an offending creditor should not be permitted to look for payment to parties who, but for the ECOA violation, would not have incurred personal liability on the underlying debt in the first instance. This rule places a creditor in no worse position than if it had adhered to the law when the credit transaction occurred. A creditor may not claim to have relied factually upon a guarantor's assets if it has never requested nor received financial information regarding them. Further, a creditor may not claim legal reliance on a signature that was illegally required in the first instance.

With regard to other credit applicants involved in a tainted credit transaction—the primary credit seeker and permissibly required sureties or guarantors for example—I conclude that the purpose of the ECOA would not be furthered by permitting them to assert an alleged ECOA violation as a defense to liability on the underlying debt. These parties' liability for the underlying debt exists independent of the alleged ECOA violation. Congress did not enact the ECOA to permit permissibly bound debtors to escape contractual liability when called upon to perform. To allow an ECOA defense to liability in such circumstances would not advance Congress' stated intent to allow creditworthy applicants to enter into credit transactions without regard to their marital status.

In stating that permissibly bound debtor parties may not assert an ECOA violation to escape liability on the underlying debt it does not follow that these parties cannot suffer an injury cognizable under the ECOA. A cognizable injury to such a party may occur if—as an objectively qualified loan applicant or guarantor—the party is nonetheless impermissibly required to secure a spouse's or other party's signature pursuant to a loan transaction. The ECOA affords these parties an affirmative

---

**22.** 839 F.Supp. 326 (E.D.Pa.1993).

cause of action for their actual "actual damages sustained" under 15 U.S.C. § 1691e(a).[23]

Other cases employing similar reasoning include *Silverman v. Eastrich Multiple Investor Fund*[24] and *FDIC v. Medmark, Inc.*[25]

We agree with these authorities both as interpretations of ECOA and as analogous authority concerning how state law should be applied. If Northrim Bank had fully complied with ECOA and its state law counterparts, Vern would still be liable under the 1996 guaranty. Ordering the forfeiture of a permissibly required guaranty that was obtained along with an impermissibly required one does not seem necessary to deter lending institutions from illegal conduct. The array of other potential sanctions, including compensatory damages,[26] punitive damages in egregious cases,[27] injunctive relief,[28] criminal sanctions,[29] and the voiding of the impermissibly required guaranty along with actual attorney's fees to the party whose guaranty was impermissibly required,[30] all serve to deter forbidden conduct.

### F. Did the Trial Court Err by Granting Summary Judgment in Favor of Wanda?

On cross-appeal Lloyd argues that the superior court should not have granted summary judgment in favor of Wanda. He argues that Wanda had the burden of establishing that Premier, rather than Vern, was independently creditworthy. He also contends that there was no evidence that Northrim required Wanda to sign a guaranty for the impermissible reason that she was Vern's spouse and that there were questions of fact as to whether the bank required her guaranty because it was relying on joint property owned by the Stills or on Wanda's annual wages of some $54,000.

Lloyd's first point—that the relevant inquiry was whether Premier Homes rather than Vern was independently creditworthy—is without merit. The applicable regulation is 12 C.F.R. § 202.7(d) (2004). It provides:

Signature of spouse or other person—

(1) Rule for qualified applicant. Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

Under the regulations, both Premier and Vern were applicants.[31] But since Wanda is the spouse of Vern, not Premier, the "applicant" whose standard of creditworthiness is at issue in the present context is Vern.

Concerning Lloyd's argument that Wanda failed to produce evidence that Northrim discriminated against her based on marital status, the actual legal question that must be addressed need not be stated in those broad terms. The applicable regulation is 12 C.F.R. § 202.7(d)(1), set forth above. Under this regulation, requiring the signature of an applicant's spouse is prohibited if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested. As to this question the evidence presented by the Stills showed that Vern was independently creditworthy, that his creditworthiness did not depend on jointly owned property, and that Northrim did not require Wanda to sign a guaranty because of her income.

The superior court discussed these points as follows:

Vern Still states in his affidavit that he was creditworthy without his wife. Mr. Cunningham contends that this is a self-

23. *Id.* at 329–30 (citation omitted).

24. 51 F.3d 28 (3d Cir.1995).

25. 897 F.Supp. 511 (D.Kan.1995); *see also, Southwestern Pennsylvania Reg'l Council, Inc. v. Gentile,* 776 A.2d 276, 282 (Pa.Super.2001); *Eure v. Jefferson Nat'l Bank,* 248 Va. 245, 448 S.E.2d 417, 421 (1994).

26. *See* AS 22.10.020(i); *Loomis v. Schaefer,* 549 P.2d 1341, 1343 (Alaska 1976).

27. *Id.*

28. *Id.*

29. AS 18.80.270.

30. *See infra* pages 26–29.

31. 12 C.F.R. § 202.2(e) (2004).

serving statement made during litigation that does not raise an issue of fact. The bank's documents, however, note that Mr. Still was the owner of StillMeyer Corp., which owned a large subdivision, and the Valley Water Company. A 1998 report discusses Mr. Still's financial condition and makes no mention of Mrs. Still. Because the Stills filed joint tax returns, Mr. Still's tax return necessarily included income information about his wife. But, the joint tax return does not show whether or not Northrim relied on Mrs. Still's income. Moreover, Mr. Roderick stated in his deposition that Mrs. Still's signature was of little importance to the loan transaction, thus seemingly admitting that Premier Homes would have been able to obtain the line of credit without Mrs. Still's guaranty.

Lloyd Cunningham argues that the Stills have failed to show that there are no factual issues regarding whether Mr. Still was creditworthy on his own. A March 5, 1997, internal report states that "[f]inancial strength and depth of Premier Homes lay with Vern *and Wanda Still*" and *"[t]heir* 2/97 statement shows a Net Worth of $4.9 million." The same report, however, attributes this net worth to the Valley Water Company and the real estate holdings of StillMeyer. Wanda Still had no interest in either company. The W-2 form indicates that the reported wages for the Stills were solely those of Wanda Still, who was employed by Valley Water Company. Mr. Cunningham argues that Northrim may have been justified in obtaining Mrs. Still's signature on a guaranty, because the presence of information about her in the loan file shows that the bank might have used the joint finances of Vern and Wanda Still, particularly her salary, in the decision about Premier Homes' loan. There is no evidence to support this speculation. The loan was to be paid primarily in one large balloon payment approximately a year after the date on the note. Even the gross amount of Mrs. Still's salary was only about 1/4 of the total principal owed when the note matured. No juror could reason-

ably believe that the relatively small amount of cash that might be available from Mrs. Still's salary was important to Northrim's decision on loan No. 200 to Premier Homes. The Stills' $4.9 million net worth (all or most of which came from Mr. Still's companies) noted in the bank's report was many times greater than Mrs. Still's salary. Nothing in Northrim's loan files has been brought to this court's attention from which an inference could be made that Vern Still was not sufficiently creditworthy individually to guarantee the loans to Premier Homes along with the other shareholders and officers of the company. Mr. Roderick stated in his deposition that he believed Wanda Still was of no importance to the credit transaction.

(Citation footnotes omitted.) We agree with the court's analysis and with its conclusion that "Vern Still was independently creditworthy without Wanda Still's salary or her interest in jointly owned property. No jury could reasonably find otherwise."

### G. Should Wanda Have Been Awarded Attorney's Fees under a Reasonable Actual Fee Standard?

The superior court ruled that Wanda was the prevailing party and awarded her attorney's fees of $1,992.15. This award was made under Civil Rule 82(b)(2), which provides for a partial award of attorney's fees of twenty percent of reasonable and actual fees to a prevailing party who does not recover a money judgment in a case that is resolved short of trial. The trial court found that Wanda's reasonable actual fees were $9,960.75 and awarded her twenty percent of this sum.

Section 1691e(d) of ECOA provides for the recovery of a reasonable attorney's fee "in the case of any successful action under subsection (a), (b) or (c) of this section...." Subsection (c) provides for a grant of "such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter."[32] "A reasonable

---

**32.** 15 U.S.C. § 1691e(d) provides as follows:
Recovery of costs and attorney's fees
 In the case of any successful action under subsection (a), (b), or (c) of this section, the

costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection.

fee" in section 1691e(d) means a reasonable actual fee rather than a reasonable partial fee as would be awarded under Civil Rule 82.[33] Wanda argues that the court should have applied section 1691e(d) and awarded her actual fees.

In reply, Lloyd contends that a prerequisite to an award of fees under section 1691e(d) is that the litigant requesting such fees must have filed an action. Lloyd relies on *North Carolina Department of Transportation v. Crest Street Community Council, Inc.*,[34] where the United States Supreme Court held that an independent action seeking attorney's fees under 42 U.S.C. § 1988[35] could not be maintained. Instead, such fees may only be sought in litigation in which a party seeks to enforce the civil rights laws listed in section 1988.[36] We do not regard the *North Carolina* case as closely analogous authority. The Supreme Court did not rule that attorney's fees under section 1988 would not be available in an action in which the prevailing party sought to enforce one of the applicable civil rights laws as an affirmative defense or a setoff.

Whether section 1691e(d) authorizes an award of attorney's fees to a litigant who is not a plaintiff is a question of federal law. But so far as we can tell, no federal or state court has held that section 1691e(d) either permits or precludes fee awards to prevailing defendants. The parties have brought no authoritative decisions on the issue to our attention and we have found none.[37]

Our case of *Hayer v. National Bank of Alaska* presents a close analogy.[38] The *Hayer* case arose when the bank sued the Hayers for a debt. They defended claiming that the bank had violated the federal Truth in Lending Act, 15 U.S.C. § 1601–65. They claimed

that they were entitled to a partial offset for statutory penalties because of the bank's violations. The trial court found that the debt was owed and that the Hayers were entitled to a partial offset because the bank had violated the federal act. The court made no award of costs or fees to the Hayers. They appealed claiming, in part, that they were entitled to an award of attorney's fees under 15 U.S.C. § 1640(a)(3), which "provides that a creditor violating the Truth–in–Lending Act is liable 'in the case of any successful action to enforce [rights under the act for] the costs of the action, together with a reasonable attorney's fee as determined by the court.' "[39] We held that the Hayers were entitled to attorney's fees under this provision, even though their claim was asserted as a setoff:

> It might be argued that the rationale behind such an award of attorney's fees is inapplicable where the debtor is the defendant instead of the plaintiff and asserts the Truth–in–Lending violation as a setoff to a suit on the underlying debt. We see no reason to make such a distinction. At least one case holds that attorney's fees are to be awarded where the debtor prevails on a counterclaim, *Robert Levitan & Sons, Inc. v. Francis*, 88 Misc.2d 125, 387 N.Y.S.2d 35 (1976), and we can see no significant difference between a setoff and a counterclaim in this context. Because of the Hayers' assertion of their Truth–in–Lending Act claim, the appellee, a large state-wide bank, had been alerted to its non-compliance with the federal act and will presumably take steps to ensure future compliance. The congressional policy of enforcement through private litigation will thus have been furthered by assertion

33. *See Hayer v. Nat'l Bank of Alaska*, 663 P.2d 547 (Alaska 1983).

34. 479 U.S. 6, 107 S.Ct. 336, 93 L.Ed.2d 188 (1986).

35. 42 U.S.C. § 1988 states in relevant part: "In any action or proceeding to enforce a provision of ... Title VI of the Civil Rights Acts of 1964 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

36. *North Carolina*, 479 U.S. at 11, 107 S.Ct. 336.

37. Courts in two cases, in dicta, have stated or implied that a prevailing defendant may not rely on that statute for an award of attorney's fees. *Integra Bank/Pittsburgh v. Freeman*, 839 F.Supp. 326 (E.D.Pa.1993) (implying in dictum that attorney's fees would not be available under statute to defendant seeking recoupment); *Durdin v. Cheyenne Mountain Bank*, —— P.3d ——, at ——, 2004 WL 352089, at 6 (Colo.App., Feb.26, 2004) (stating in dictum that fees are not available under this statute to defendants).

38. 619 P.2d 474 (Alaska 1980).

39. *Id.* at 476.

of the Hayers' claim. We believe therefore that the court should have awarded them a reasonable attorney's fee.[40]

 We believe that this rationale applies as strongly to ECOA violations as to Truth–in–Lending Act violations. We conclude therefore that the court should have awarded Wanda reasonable actual attorney's fees. On remand the superior court should award Wanda a fee of $9,960.75 for her successful assertion of her entitlement to equitable relief under 15 U.S.C. § 1691e(c).

**40.** *Id.*

## IV. CONCLUSION

The award of attorney's fees to Wanda Still is REVERSED. On remand the court should award her $9,960.75. In all other respects, the judgment of the superior court is AFFIRMED.

